GERALD SCHUSTER *vs.* CARL BASKIN & others.

Suffolk.    March 8, 1968. — April 3, 1968.

Present: WILKINS, C.J., WHITTEMORE, CUTTER, & KIRK, JJ.

*Release. Practice, Civil,* Exceptions: what questions open. *Evidence,* Extrinsic affecting writing.

Where the judge at the trial of an action did not ask for a specification of the grounds upon which the defendants relied in moving for a directed verdict, it was open to them, on an exception to denial of the motion, to contend that recovery was barred by a general release pleaded and introduced in evidence. [140]

A general release under seal expressing no exceptions to its scope barred recovery by the releasor against the releasees for breach of an oral contract allegedly entered into by the releasor and the releasees at the time of and as part of a transaction in which the release was given. [140–141]

CONTRACT.    Writ in the Superior Court dated September 20, 1962.

The action was tried before *Goldberg,* J.

*Robert J. Sherer* for the defendants.

*Joseph B. Abrams* for the plaintiff.

CUTTER, J.    Schuster obtained a verdict of $24,931.62 for breach of an alleged oral contract between him and the defendants.    Their outline bill of exceptions presents issues concerning the trial judge's denial of a motion for a directed verdict, rulings on evidence, and portions of the charge.    The facts are stated in their aspect most favorable to Schuster.

Schuster was in the real estate business.    In 1960, he had a chance to buy land in Brighton, upon which he proposed to erect buildings with Federal Housing Administration (F.H.A.) assistance.    He obtained the coöperation of a construction man named Turner and an architect named Schwartz.    To obtain financing assistance, they interested the defendants (Baskin and his brother, both "well-informed real estate people," and Charles McLaughlin who was connected with a mortgage company).    The defendants "facilitated the F.H.A. financing," took care of arranging an

F.H.A. insured mortgage loan from a bank, and "agreed to put in" the necessary equity financing above the mortgage. This was to be done through Hancock Capital Company (Hancock), a small business investment corporation. Sinclair Construction Company, Inc. (Sinclair) was formed to be the general contractor. Regency Arms, Inc. (Regency) and Chiswick Arms, Inc. (Chiswick) were organized, each to hold one of the two pieces of land used in the project.[1]

Sinclair made contracts with Regency and Chiswick to construct the buildings. Performance bonds were required. The application for the bonds was by Sinclair and it was guaranteed by Schuster, Schwartz, and Turner and by their wives. Hancock lent $60,000 to Regency and the same sum to Chiswick. Each loan was secured by pledges of the stock (in the borrowing company) owned by Schuster, Schwartz, and Turner.

In March, 1962, the projects were in financial trouble because the buildings had cost more than had been estimated and because the advances, secured by the bank mortgage, were not adequate. On April 11, 1962, Schuster, his father-in-law Benjamin Siegel, Turner, Schwartz, McLaughlin, and the Baskins, with their attorneys, attended a meeting to discuss the situation. The projects were then about (or more than) seventy per cent complete. Schuster was outvoted on his proposal to sell the projects to a New York securities company. At length, so Schuster and Siegel testified, there was "final agreement" that "Schuster, Schwartz, and Turner, would turn over . . . [their] stock and relinquish any interest in the [Regency and Chiswick] corporations" to the two Baskins and McLaughlin and that the Baskins and McLaughlin "would in turn put all the necessary capital into the projects to complete them as quickly as possible."[2]

[1] The project and the corporations are discussed in Albre v. Sinclair Constr. Co. Inc. 345 Mass. 712, which dealt with a receivership of Regency and Chiswick.

[2] This evidence was controverted by Carl Baskin who testified that it was just an agreement that the defendants "would try to finish" the projects. Somewhat similar testimony came from Turner to the effect that when the defendants were asked whether Schuster, Schwartz, and Turner "could receive any guarantees that the work would be completed and adequate funds

This alleged oral agreement is the contract for breach of which this action is brought. Schuster himself testified (as did Siegel) that "there was no written agreement" with relation to the defendants' undertaking "to put in whatever money was necessary and hold . . . [him] harmless to the bonding company," although he "asked for it to be in writing."

In any event, Schuster, Schwartz, and Turner did assign their Regency and Chiswick stock to the defendants and resigned their positions in these two corporations. They also on that day executed as sealed instruments general releases running to the several corporations, to McLaughlin, and to each of the Baskins. These were in the usual broad form covering "all claims and demands." Schuster was then represented by his attorney, Mr. Goldstein.

In August, 1962, Schuster and his wife received letters from an attorney for the bonding company which had written the performance bond asking that they, as indemnitors, take action to save the bonding company harmless from loss. Later he was sued by that company on his guaranty of the performance bond. There was evidence that the bonding company participated in finishing the projects, and that at least Turner, as guarantor of the bond agreement, had paid $15,000 for a release by the bonding company from his guarantor's obligation. Upon receipt of the bonding company's demand, Schuster paid a retainer of $1,500 to his attorney, Mr. Goldstein, and also a $1,500 retainer to his present trial counsel.

At the close of the evidence, counsel for the defendants moved for a directed verdict in their favor, upon the pleadings and the evidence. This motion was denied.

1. The defendants' principal contention is that the general release under seal given by Schuster to each of them

---

would be put in . . . which would save . . . [them] harmless . . . on the [performance] bond," the statement was made that the defendants anticipated an investment of $150,000 to $200,000 which "should be sufficient evidence . . . that they were seriously intending to try and complete the projects. They [the defendants] were not willing to guarantee the completion of the projects."

bars any recovery in this action. The release was pleaded and there is no dispute that the release was signed and delivered on April 11, 1962. Schuster gave a similar release to Schwartz and to Turner.

! So far as the printed record and record appendix reveal, the defendants did not file any request for instructions relating to the releases nor did they specify the releases as one of the grounds for their motion for a directed verdict. The judge did not ask counsel to specify the grounds upon which the defendants relied, so issues based on the release are open to them. *Trites* v. *Melrose*, 318 Mass. 378, 380.[3] The release was in evidence and, on Schuster's own evidence, its execution and delivery were not in dispute. If as matter of law the release barred recovery, a verdict for the defendants should have been directed. *Willett* v. *Herrick*, 258 Mass. 585, 609. See *Barrett* v. *Brooks Hosp. Inc.* 338 Mass. 754, 760–762; *Sherman* v. *Koufman*, 349 Mass. 606, 610–611. See also *Pahigian* v. *Manufacturers' Life Ins. Co.* 349 Mass. 78, 85–87; *Flanagan* v. *John Hancock Mut. Life Ins. Co.* 349 Mass. 405, 409.

The release is broad and general. As we said in *Naukeag Inn, Inc.* v. *Rideout*, 351 Mass. 353, 356, it is "to be given effect, even if the parties did not have in mind all the wrongs which existed at the time of the release. *Willett* v. *Herrick*, 258 Mass. 585, 595. *Willett* v. *Webster*, 337 Mass. 98, 104. *Sherman* v. *Koufman*, 349 Mass. 606, 610–611. If exceptions to the scope of the releases were intended, they should have been stated. See *Radovsky* v. *Wexler*, 273 Mass. 254, 258. See also *Pitman* v. *J. C. Pitman & Sons, Inc.* 324 Mass. 371, 375." The release, by its terms, imports a final disposition "of all claims and demands arising out of any transactions between" the parties. See *Willett* v. *Herrick*, 258 Mass. 585, 594–595, 609. If it had intended to leave in effect any continuing obligation whatsoever of the defendants to Schuster,

---

[3] In the *Trites* case, Mr. Justice Ronan pointed out (p. 380) that if a trial judge does not "require the moving party to state all the grounds upon which he relies in support of the motion . . . an exception to the denial of the motion leaves open every ground in support of the motion even though not mentioned or even thought of at the time of the trial."

including any obligation under any oral or written executory agreement, that obligation should have been specified in the release as an exception. There was no evidence of fraud or other illegal acts operating to produce its execution or contributing to it as a cause. Because under seal, the consideration, if any, was immaterial. See *Willett* v. *Herrick*, 258 Mass. 585, 594. To permit reliance on an oral agreement entered into at or prior to the release would involve violation of the "substantive rule of law known as the parol evidence rule." *Sherman* v. *Koufman*, 349 Mass. 606, 610. See *Tupper* v. *Hancock*, 319 Mass. 105, 108.

2. Because of our decision upon the release, it is unnecessary to consider other exceptions argued.

*Exceptions sustained.*

*Judgment for the defendants.*